United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8                      IN THE UNITED STATES DISTRICT COURT

9                     FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                               SAN JOSE DIVISION

11   ALLEN RAY ADAMS II,                          NO. C 03-04994 JW

12                  Petitioner,                   **ORDER DENYING PETITION**
          v.                                      **FOR WRIT OF HABEAS CORPUS**
13

14   ROY CASTRO,

15                  Respondent.
     _____/
16

17                             **I.  INTRODUCTION**

18       Petitioner Allen Ray Adams II ("Petitioner") filed a petition for a writ of habeas corpus in this Court

19   on November 10, 2003 contesting a Humboldt County jury verdict, which resulted in a conviction of (1)

20   one count of first degree murder with a deadly weapon; (2) assault with a deadly weapon, with the intent to

21   commit great bodily harm; and (3) simple assault. Petitioner was acquitted of attempted first degree murder.

22   The First Appellate District of the California Court of Appeal affirmed the conviction and the California

23   Supreme Court denied review.  Having exhausted his state remedies, this Court now reviews Petitioner's

24   request pursuant to authority under 28 U.S.C. § 2254.  Petitioner raises numerous constitutional issues,

25   *inter alia*, his right to due process and equal protection, his right to effective assistance of counsel and

26   effective expert witness, and his right to present a defense and to have trial by jury.  (See Pet. for Writ of

27   Habeas Corpus.)  After examining the record and the papers submitted by the parties in support of their

28   respective positions, the Court denies the petition.

**II. BACKGROUND**

**A. The Attack on May 6, 1995**

Petitioner, age seventeen at the time of arrest, was charged with the first degree murder of Mark Sheive ("Sheive"), attempted first degree murder of Patrick McKay ("McKay"), and assault on Donald Counts ("Counts"). On about midnight on May 6, 1995, Petitioner and his friends, who were all teenagers, brought two or three 12-packs of bottled beer to the home of Blaine and Brent Seaman to drink, as the Seaman brothers' parents were not home.[1] (Mem. of Points and Authorities in Supp. of Answer ("Answer") at 2:18-19.) Prior to arriving at the Seaman residence, Petitioner allegedly drank one-half of a sixteen-ounce vodka-cranberry drink with Jackie Burrow, a 22 year old friend, who purchased the 12-packs of beer for the teenagers. (Mem. of Points and Authorities in Supp. of Pet. ("Pet.") Ex. A at ¶ 5 and Pet. Ex. C at ¶ 3.)

By approximately 1:30 a.m., Petitioner, Daniel Osborne, David Rasor and Blaine Seaman consumed the remaining beers. (Answer at 2:19.) In an effort to dispose of the empty bottles before the Seamans' parents returned, three of them – Petitioner, Rasor and Osborne – gathered the bottles, placed them into two 12-pack cartons, and went outside to the intersection of Girard Court and Harris Street. (Pet. at 5:22-25; Pet. Ex. A ¶ 17.) The three youths began to throw the empty bottles into a wooded area on the south side of Harris Street, with Blaine Seaman later joining the activities. (Pet. Ex. A ¶ 18.)

While Petitioner, Osborne, Rasor, and Blaine Seaman were outside at the intersection of Girard Court and Harris Street throwing bottles, Counts, a homeless man, walked by with his girlfriend. (Answer at 3:2.) Someone in the group asked Counts, who was smoking at the time, for a cigarette, but Counts declined. (Answer at 3:3; Pet. Ex. A ¶ 20.) The group surrounded and taunted Counts. Petitioner struck Counts over the head with a beer bottle. (Answer at 3:3-4; Pet. Ex. A ¶ 20.) The group continued to hassle Counts until Osborne told the group to leave him alone and told Counts to leave. (Answer at 3:4.)

---

[1] There was a discrepancy in the evidence as to the amount of beer the teenagers purchased and drank. Only two 12-pack cartons were found at the scene. However, Petitioner claims that once he arrived at the Seaman residence, he placed one 12-pack in the bathroom and gave the remaining two 12-packs to his friends, Daniel Osborne, David Rasor and Blaine Seaman. (Pet. Ex. ¶ 14.)

United States District Court
For the Northern District of California

Counts later reported the incident and his injuries to the sheriff's deputy.  (Answer at 3:5-6.)

Shortly after Counts left the scene, Sheive and McKay, both twenty-eight years old, were driving on Harris Street in Sheive's truck, returning to Eureka from an evening of drinking at Marino's Bar in Arcata.  (Pet. at 6:5-7.)  Both men had allegedly consumed five pints of beer and ingested marijuana during the two to three hours they spent at the bar.  (Pet. at 6:7-9.)  Sheive had also allegedly ingested Benzodiazepine, a controlled substance.[2]  Id.; (Pet. Ex. K and Ex. L.; Rep. Tr. 79:12-19.)  When Sheive's truck passed Girard Court, someone in Petitioner's group threw a beer bottle at it, which prompted Sheive to make a U-turn and return to the group of teenagers standing on the street.  (Answer at 3:8-10.)  Sheive and McKay stepped out of the car, demanding to know who threw the bottle at them. A loud and angry verbal confrontation ensued.  (Answer at 3:11.)

At one point during the confrontation, McKay pushed Rasor in the chest with both hands. (Pet. Ex A ¶ 31.)  Petitioner left the scene and went to the Seamans' garage to retrieve a baseball bat.  Id.  Brian Chipps, a friend of Petitioner's, arrived at the scene and parked behind Sheive's truck. When Petitioner returned to the scene holding a bat behind his back, he allegedly "made a wide circle back to the scene, crouching behind the parked cars."[3]  (Answer at 3:16.)  As Petitioner reached the group, he allegedly saw McKay push Blaine Seaman and thought that Sheive and McKay were about to beat up Blaine.  (Pet. Ex. A ¶ 34.)  Petitioner walked up behind Sheive and McKay, first swung the bat at Sheive, hitting him on the head, and then swung the bat at McKay, hitting him on the head and then again in the ribs. (Answer at 3:16-17.)  Although McKay was able to get back up with no fatal injury, Sheive was knocked unconscious and later died on May 9, 1995 from head injuries consistent with being struck with a baseball

---

[2]  Evidence of Sheive and McKay's intoxication was not presented in trial.

[3]  Petitioner disputes this characterization of his return to the scene.  He contends that "[a]fter finding the baseball bat, [he] left the Seaman house and walked directly toward the group in the street." (Pet. Ex A ¶ 33.)  Petitioner also contends that James Flower, Defendant's counsel at the time, failed to clarify Deputy Lawson's testimony about Petitioner's initial statement to him regarding an unknown third party who was "crouched down" behind a car.  (Answer at 36:9-10.)  Deputy Lawson questioned Petitioner prior to his arrest at the Seaman Residence.  (Answer at 4:5.) Petitioner alleges that the jury was left with the erroneous impression that the statement made to Deputy Lawson was a description of Petitioner's own actions.  (See Pet. at 40.)

3

1  bat.  (Answer at 3:17-18; Pet. at 9:3-4.)

2      Immediately, Osborne took the bat away from Petitioner and said, "You're stupid.  I hope you

3  didn't kill him."  (Answer at 3:19; Pet. at 8:18.)  Petitioner, who appeared scared, surprised and confused,

4  replied, "I hope I didn't either."  (Answer at 3:20; Pet. at 8:18.)

5  **B.  The Investigation**

6      Shortly after 2:00 a.m., while the paramedics were still rendering medical assistance to Sheive and

7  McKay, Deputy John Sylvia of the Humboldt County Sheriff's Department arrived at the scene.  (Answer

8  at 3:24.)  When Deputy Sylvia spoke to Petitioner, he detected the odor of alcohol on Petitioner's breath

9  and noted that Petitioner appeared intoxicated.  (Answer at 4:2; Pet. at 8:22-23.)  Petitioner and Rasor

10 falsely told Deputy Sylvia that an unknown third party "[came] from behind the parked cars, hit the two

11 victims with a baseball bat while they were talking to David Rasor, and then fled."  (Answer at 4:2-3.)

12     Petitioner was later arrested after two other sheriff's deputies, Deputy Lawson and Deputy Knight,

13 questioned both Petitioner and Osborne at the Seaman residence.  (Answer at 4:5.)  Ten beer bottle caps

14 were found in Petitioner's jacket pocket at the time of arrest.  (Answer at 4:10.)  On the way to the

15 sheriff's station, Petitioner "told Deputy Knight that he had been afraid the two victims were going to assault

16 Blaine Seaman and beat up his friends. . . .  [Petitioner] also remarked that he wished he had hit them in the

17 legs, not in the head."  (Answer 4:10-12.)

18 **C.  State Criminal Trial Proceedings**

19     On May 10, 1995, James Flower, a public defender in the Humboldt County Public Defender's

20 Office assigned to the Juvenile Court, was appointed to represent Petitioner since he was only seventeen

21 years of age at the time of the incident.  (Pet. Ex. J 2:21.)  At that time, the public defender had been

22 practicing law for over ten years.  (Pet. Ex. J at 3:13-14.) Petitioner's counsel had only handled one adult

23 criminal jury trial prior to Petitioner's case and was still required to maintain a large caseload of juvenile

24 delinquency cases. However, following the determination that Petitioner was unfit for treatment in Juvenile

25 Court, he continued to represent Petitioner.  (Pet. Ex. J at 3:20-22; Pet. Ex. VV.)  Petitioner's counsel

26 allegedly informed Petitioner and his family of his lack of experience in dealing with an adult murder trial,

27

28                                              4

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    however, Petitioner's parents remained satisfied with Petitioner's counsel.  (Pet. Ex. VV at ¶ 5.)  At the

2    time of the trial, the Public Defender's office employed only ten attorneys.  (Pet. Ex. J at 3:17.)

3            At trial, despite Petitioner's expressed desire to testify at trial, Petitioner's counsel strongly advised

4    Petitioner not to testify for fear that the prosecutor would introduce prior incidents of violence by Petitioner,

5    which he believed to be damaging to the defense.[4]  (Answer to Order to Show Cause Ex. 6 ¶ 4; Pet. Ex. A

6    ¶ 39.)  Furthermore, Petitioner's counsel believed that Petitioner's credibility would be destroyed on cross-

7    examination by Deputy District Attorney Worth Dikeman.  (Answer to Order to Show Cause Ex. 6 ¶ 6.)

8            The only person to testify on behalf of Petitioner at the jury trial was Dr. Stephen Pittel, a forensic

9    psychologist, testifying as an expert on alcohol use and its effect on human feelings, thoughts and

10   behaviors.[5]  Dr. Pittel prepared a series of estimates of Petitioner's blood alcohol concentration ("BAC")

11   using (1) Petitioner's weight, (2) the size and time of his last meal, (3) the amounts and times of his

12   consumption of alcohol, and (4) corroboration of this information from sources other than Petitioner.  (Pet

13   Ex. HH at ¶ 8.)  Dr. Pittel calculated the BAC estimates, which ranged from .1533 to .2572 "depending on

14   whether [Petitioner] consumed 8, 10, 11, or 12 bottles and whether the beer was consumed in 1 ½ hours

15

16

17

18   _____

19       [4]  There was one incident where Petitioner and his friends allegedly threw pennies at people from a
     moving car, with one hitting Carl Faulkner, who was walking down the road.  After they threw the penny,
20   Petitioner allegedly got out of the car and proceeded to beat up Faulkner for no apparent reason, causing
     serious injury.  (Answer to Order to Show Cause Ex. 6 ¶ 5.)  Petitioner's counsel stated that "this incident
21   was similar to the one at issue in the trial, because in both cases [Petitioner] and his friends tried to provoke
     the victim by throwing something at them, and [Petitioner] was the only one of the group who then inflicted
22   physical harm on the victim."  Id.  However, Petitioner claims that the incident was "very minor, that no one
     was injured and that the versions of these incidents that Mr. Petitioner's counsel related to [Petitioner] were
23   not accurate."  (Pet. Ex. A at ¶ 39.)

24       [5]  Jackie Burrow, the person who purchased the beer for Petitioner, was not called as a witness on
     Petitioner's behalf.  Petitioner contends that Jackie Burrow could have testified that Petitioner consumed
25   one-half of a 16-ounce vodka-cranberry mixed drink and that she purchased three 12 packs of beer for the
     under-aged boys.  (Pet. at Ex. A at ¶ 45 and Ex. C at ¶¶ 3,8.)  Petitioner's counsel allegedly informed him
26   that he "decided not to call Burrow at the trial because he did not need her to establish the amount of beer
     purchased."  (Pet. Ex. A at ¶ 44.)  However, Petitioner's counsel alleges that no other witnesses were
27   called in the defense case because everyone that "had knowledge concerning the incident [was] called by
     the prosecution and were subject to his cross-examination."  (Pet. Ex. J at 4:6-8.)

28                                                     5

or 2 hours."[6]  (Answer at 4:19-20.)  He opined that Petitioner's BAC was between .19 and .24, and he would have experienced mental confusion, distorted perception, difficulty in thinking, and impaired judgment.  (Answer at 4:22-23.)

On cross-examination, it was revealed that Dr. Pittel had been arrested for possession of cocaine in 1990.  (Pet. at 3:15.)  During a break, the prosecutor obtained a copy of the police report of the arrest, and when trial resumed, questioned Dr. Pittel about the arrest.  (Pet. Ex. J at 3:11-12.)  Petitioner's counsel immediately moved to strike the evidence and for a mistrial.  (Answer at 21:8.)  The trial court denied both motions, finding that Petitioner's counsel was aware of the arrest,[7] and that the evidence was "a proper subject of cross examination for bias."  (Answer at 21:20-21.)  However, the trial court issued a limiting instruction, directing the jury to consider the evidence "only for the limited purpose of determining if it tends to show whether Dr. Pittel has any bias against law enforcement or the criminal justice system and whether that bias renders unreliable opinions to which Dr. Pittel has testified concerning the charges against the defendant."  (Answer at 21:28, 22:1-2.)

At the conclusion of the trial, the trial court gave jury instructions on murder by lying in wait over Petitioner's counsel's objections.  The jury returned a verdict against Petitioner, convicting him of first

---

[6]  Dr. Pittel alleges that if he had known and used the correct weight of Petitioner to calculate the BAC estimates, which was 181 pounds and not 165 pounds, the prosecutor would not have been able to use this discrepancy to attack his testimony.  (Pet. Ex. HH at ¶ 9.)  Dr. Pittel also contends that his BAC estimates for Petitioner would have increased to at least .26 at the time of the incident if Petitioner's counsel had given him additional corroborated and available information that Petitioner (1) had not eaten for several hours before drinking on the night of the incident, (2) consumed about one-half of a large vodka-cranberry drink, and (3) consumed 10 bottles of beer between midnight and 1:20 a.m. with a 40 minute lapse between the time Petitioner finished drinking the beer and the assault upon Sheive at 2:00 a.m.  (Pet. Ex. HH ¶¶ 9-15.)

[7]  Although Petitioner's counsel first contacted Dr. Pittel to act as an expert in Petitioner's case on November 8, 1995, Petitioner's counsel was unaware of Dr. Pittel's prior arrest until Dr. Pittel revealed this information during a telephone conversation on March 8, 1996.  (Pet. Ex. J at 3:4-5.)  Despite Petitioner's counsel's awareness of Dr. Pittel's arrest before the start of trial, he stated that he felt that his "hands were tied, as [he] was unsure of having the time and available resources to procure another helpful expert," and continued to call him as an expert for Petitioner's case.  (Pet. Ex. VV at ¶ 21.)  Furthermore, Petitioner's counsel claims that he relied on controlling case law which indicated that he would receive a warning if the District Attorney decided to use the arrest to impeach Dr. Pittel.  (Pet. Ex. VV at ¶ 22.)

United States District Court
For the Northern District of California

degree murder of Sheive, assault with a deadly weapon on McKay, and simple assault on Counts.[8]  (Pet. Ex. E at 5.)  Petitioner was sentenced to prison for 25 years to life for murder with consecutive terms of 3 years and 180 days for the assaults, in addition to 4 years for use of a deadly weapon in the murder and for infliction of great bodily injury in the assault on McKay.  Id.

**D.  Procedural History**

Petitioner appealed his conviction, and the California Court of Appeal affirmed, finding no error in allowing the prosecution to use Dr. Pittel's arrest record for impeachment.  (Pet. Ex. E at 1.)  The California Supreme Court denied Petitioner's application for review.  (Pet. Ex. F.)  Petitioner then filed a petition for writ of habeas corpus in the California Superior Court in Humboldt, which was subsequently denied on its merits on April 29, 2002.  (Pet. Ex. J.)  The California Court of Appeal and the California Supreme Court also denied the petition for writ of habeas corpus.  (Pet. Ex. GG and WW.)

Having exhausted his state remedies, the Petitioner is now before this Court, seeking a federal habeas corpus petition.  Petitioner raises numerous constitutional issues, inter alia, his right to due process and equal protection, his right to effective assistance of counsel and effective expert witness, and his right to present a defense and to have trial by jury.  (See Pet. for Writ of Habeas Corpus.)  Petitioner's claims that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated based upon: (1) trial counsel's failure to call Petitioner as a witness; (2) trial counsel's failure to introduce exculpatory evidence; (3) trial counsel's decision to call an expert witness; (4) trial counsel's closing argument; (5) trial counsel's numerous additional errors; (6) trial court's erroneous jury instruction on murder by lying in wait; (7) insufficient evidence of lying in wait; (8) insufficient evidence to support a finding of premeditation and deliberation; and (9) the cumulative effect of the constitutional errors at trial.

## III. STANDARDS

This Court may "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

---

[8]Petitioner was acquitted of the separately charged offense of attempted willful, deliberate and premeditated murder of Patrick McKay.

United States District Court
For the Northern District of California

Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); <u>Rose v. Hodges</u>, 423 U.S. 19, 21 (1975).  Under the first prong of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court has the authority to grant a writ of habeas corpus if the state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." § 2254(d)(1); <u>see</u> <u>Lockyer v. Andrade</u>, 123 S. Ct. 1166, 1172-73 (2003).

A state court decision is "contrary to" clearly established federal law if the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000).   An "unreasonable application" of governing legal principles from the Supreme Court arises when a state court identifies the correct legal principle, "but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u>

The habeas applicant bears the "burden to show that the state court applied federal law to the facts of his case in an objectively unreasonable manner . . . [which] is different from an incorrect application of federal law." <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002).  Furthermore, circuit decisions are relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." <u>Clark v. Murphy</u>, 331 F.3d 1062, 1070-71 (9th Cir. 2003).

Under the second prong of AEDPA, a federal court also has the authority to grant a habeas petition if the state court's decision on the merits "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(2).  Unless the applicant rebuts with clear and convincing evidence, the determination of a factual issue by a state court is presumed correct.  <u>See</u> § 2254(e)(1).  Where the state court fails to make findings of fact, however, the reviewing court grants less deference to the state court's decision.  <u>Weaver v. Thompson</u>, 197 F.3d 359, 363 (9th Cir. 1999).

**IV.  DISCUSSION**

**I. Ineffective Assistance of Counsel**

Petitioner alleges that his counsel was ineffective for the following reasons: (1) failing to call petitioner as witness; (2) failing to introduce readily available exculpatory evidence; (3) calling an expert witness whose arrest prejudiced Petitioner; (4) giving an incompetent closing argument; and (5) committing additional errors.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984).   The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id. at 686.  Therefore, to prevail on an ineffective assistance of counsel claim, Petitioner must establish two things. First, Petitioner must establish that counsel's performance was deficient, meaning, that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland, 466 U.S. 687-88. Second, Petitioner must establish that he was prejudiced by counsel's deficient performance. Id. at 694.  Prejudice is shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.  A court need not determine whether counsel's performance was deficient if the lack of prejudice is clear. Id. at 697.

The Strickland framework for analyzing ineffective assistance of counsel claims is considered to be the clearly established federal law, as determined by the Supreme Court of the United States for the purposes of 28 U.S.C. §2254 analysis.  Williams, 529 U.S. at 405.  In order to show deficient performance under Strickland, Petitioner must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The relevant inquiry is not what defense counsel would have done, but rather whether the choices made by defense counsel were reasonable. The reasonableness of  counsel's decisions must be measured against the prevailing legal norms at the time counsel represented Petitioner. Wiggins v. Smith, 123 S. Ct 2527, 2536-

9

**United States District Court**
For the Northern District of California

37 (2003) (citing American bar Association professional standards and standard practice in capital defense at pertinent time).

For the reason discussed below, the Court concludes that the ineffective assistance of counsel claims fail because the actions taken by Petitioner's counsel were reasonable and Petitioner was not prejudiced.

**A. Counsel's failure to call Petitioner as a witness**

Petitioner alleges that his defense counsel provided ineffective assistance in failing to call him as a witness. Moreover, Petitioner alleges that the denial of the right to testify had a substantial and injurious effect on the verdict. Petitioner's arguments are without merit.

When a defendant, "on advice of counsel, knowingly and voluntarily, if reluctantly, refrained from testifying in his own defense," no constitutional error occurs. <u>Campbell v. Vaughn</u>, 209 F.3d 280, 291 (3rd Cir. 2000). Petitioner's counsel may have forcefully urged Petitioner not to testify, however, counsel also said Petitioner could make the final decision. Furthermore, counsel's advice was imminently reasonable given Adam's past. Petitioner had been involved in (1) an assault on a man named Carl Faulkner in Eureka in October 1994; (2) an assault on a transient about a month before the homicide; and (3) several vehicle thefts resulting from Petitioner's unlawfully driving cars taken from a gas station where Petitioner worked. The prosecutor indicated that he did not intend to introduce evidence of the prior bad acts in his case in chief. However, he also stated that the evidence of assaults would be admissible under Cal. Evidence. Code § 1103 if Petitioner attempted to show that he had a non-violent character, and that the vehicle thefts would come into play as evidence of moral turpitude only if Petitioner testified. Respondent's Answer at 7. Understandably, counsel did not want Petitioner to testify because he believed that the prior bad acts would be devastating to Petitioner's defense.

**B. Failure to introduce readily available exculpatory evidence**

Petitioner contends that his counsel was ineffective because he did not introduce evidence concerning the amount of alcohol consumed by Petitioner. Petitioner's mental state and the extent of his intoxication were vitally important to the defense's case. However, the additional evidence likely would not

10

1    have changed the outcome of the case, and the claim is therefore without merit.  There was compelling

2    evidence that, regardless of whether two or three twelve-packs of beer were purchased, Petitioner was not

3    so impaired that he could not form the requisite mental state for first degree murder. The sheriff who

4    interacted with Petitioner shortly afterwards did not find him drunk enough to justify public intoxication.

5    More importantly, Petitioner had the mental faculty to fabricate a story of a stranger committing the attacks

6    as a coverup, thereby refuting his claim that he was too drunk to form specific intent.

7    **C. Decision to call expert witness**

8         Petitioner contends that he received ineffective assistance of counsel and was denied the right to

9    expert assistance because the expert witness, Dr. Pittel, had been previously arrested for cocaine

10   possession.  The Court rejects the argument.

11        In Ake v. Oklahoma, 470 U.S. 68, 83 (1985), the Supreme Court held that due process requires

12   indigent defendants to be provided with "access to a competent psychiatrist," a role which Dr. Pittel

13   adequately fulfilled.  Petitioner cites no Supreme Court authority holding that Ake encompasses a right to a

14   mental health expert who is immune from impeachment.  Furthermore, it is significant that the jury was given

15   an instruction that it could consider Dr. Pittel's arrest for the limited purpose of determining if it tends to

16   show whether Dr. Pittel has any bias against law enforcement.

17   **D. Counsel's closing argument**

18        Petitioner contends that he received ineffective assistance of counsel at closing argument, and that

19   his appellate counsel was ineffective for failing to raise this issue on direct appeal.

20        The United States Supreme Court recently summarized the standard for evaluating the effectiveness

21   of defense counsel's closing argument on federal habeas review.  "The Sixth Amendment guarantees

22   reasonable competence, not perfect advocacy judged with the benefit of hindsight."  Yarborough v Gentry,

23   124 U.S. at 6.  Moreover, "counsel has wide latitude in deciding how best to represent a client, and

24   deference to counsel's tactical decisions in his closing presentation is particularly important because of the

25   broad range of legitimate defense strategy at that stage." Yarborough v Gentry, 124 U.S. at 4.

26        Trial counsel's technique in delivering his closing argument relied upon establishing credibility with

27

28

the jurors. Counsel did so by acknowledging how "shocking" the case was, and what a senseless tragedy had occurred.  Counsel went on, however, to argue that Petitioner did not have the requisite statement of mind for the charged crimes.  Counsel's tactical approach was not ineffective.  The ample evidence in this case indicates that trial counsel's closing argument was well within the general standard of care required for federal habeas review.

**E. Numerous additional errors**

Petitioner contends that trial counsel made additional errors, which considered cumulatively, deprived him of effective assistance of counsel.  This Court finds that individually, as well as cumulatively, these instances did not prejudice Petitioner adequately to constitute ineffective assistance of counsel.

**II. Trial Court's Instructions on Lying in Wait**

Petitioner claims that the lying in wait instruction given to the jury violated due process, and that his appellate counsel was ineffective for failing to raise this claim on direct appeal.

A claim of state instructional error can be the basis of federal habeas relief only if the error "so infected the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. at 72. The mere fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief. Id. at 71-72. The test for constitutional error is whether there is a "reasonable likelihood" the jury applied the instructions in a way that prevented consideration of constitutionally relevant evidence. Boyde v. California, 494 U.S. 370, 380 (1990). The challenged instruction must be evaluated in light of the instructions as a whole and the evidence introduced at trial. Estelle, 502 U.S. at 72. If the habeas court finds constitutional error under the Boyde test, it must then assess prejudice by determining whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Calderon v. Coleman, 525 U.S. 141, 147 (1998)(per curiam) (quoting Brecht v Abrahmson, 507 U.S. 610, 637 (1993)).

The trial court gave the following challenged instruction on lying in wait:

Murder which is immediately preceded by lying in wait is murder of the first degree.  The term "lying in wait" is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise even though the victim is aware of the murderer's presence.  The lying in

United States District Court

For the Northern District of California

1   wait need not continue for any particular period of time provided that its duration is such as
2   to show a state of mind equivalent to premeditation or deliberation.  The word
    "premeditation" means considered beforehand.  The word "deliberation" means formed or
3   arrived at or determined upon as a result of careful thought and weighing of considerations
    for and against the proposed course of action.

4   If you find that the defendant was voluntarily intoxicated, you must consider the fact of such
    intoxication in your determination of whether the defendant possessed a state of mind
5   equivalent to premeditation or deliberation prior to the assault.  If you have a reasonable
    doubt as to the defendant's ability to form or possess such a state of mind you must find
6   that he did not have the ability to lay in wait to murder Mr. Sheive.

7   (RT 672:27 - 673:22.)  Petitioner contends the instruction failed to include every element of lying

8   in wait, because it stated that lying in wait occurs when its duration shows a state of mind equivalent

9   to "premeditation *or* deliberation" but California law requires premeditation *and* deliberation for

10  first degree murder. Petitioner also argues that California law requires a "substantial" period of

11  watching and waiting.  He contends that the instruction violated due process, and also deprived him

12  of his "only viable defense," that he did not exhibit a substantial period of watching and waiting that

13  was equivalent to premeditation and deliberation.

14        This Court adopts the reasoning of the California Supreme Court, and concurs that the

15  instruction was not erroneous under California law.  Furthermore, even if the instruction was

16  erroneous, which it was not, such purported error was not sufficiently grave that it "so infected the

17  entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. at 72.

18  As the California Supreme Court observed, the jury was told in a separate instruction that a wilful,

19  deliberate *and* premeditated killing with malice aforethought is murder of the first degree.

20  **III. Evidence of Premeditation and Deliberation**

21        Petitioner contends that there was insufficient evidence of premeditation and deliberation to

22  support his conviction for first degree murder, and his appellate counsel was ineffective in failing to

23  raise this issue on direct appeal.  Petition at 23-24; Memorandum at 71-76.

24        A state prisoner who alleges that the evidence was insufficient to support a guilty verdict

25  beyond a reasonable doubt states a constitutional claim, which, if proven, entitles him to federal

26  habeas relief.  See Jackson v. Virginia, 443 U.S. 307, 321 (1979).  A federal court reviewing

27

28                                                   13

1   collaterally a state court conviction does not determine whether it is satisfied that the evidence

2   established guilt beyond a reasonable doubt.  <u>Payne v. Borg</u>, 982 F.2d 335, 338 (9th Cir. 1992).

3   The federal court "determines only whether, after viewing the evidence in light most favorable to the

4   prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

5   reasonable doubt."  <u>Id.</u>; <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).

6        Under California law, "deliberation" refers to careful weighing of considerations in forming a

7   course of action.  "Premeditation" means thought over in advance.  Premeditation and deliberation

8   are do not require any extended period of time.  The true test is not in the duration of time as much

9   as it is the extent of the reflection.  <u>People v. Cole</u>, 33 Cal. 4th at 1224, citation omitted.  Thoughts

10  may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.

11  <u>Id.</u>

12       Petitioner, relying on <u>People v. Anderson</u>, 70 Cal. 2d 15, 26-27 (1968), contends that

13  before premeditation and deliberation are established, the prosecution must present evidence of

14  planning, manner, and motive.  Although planning, manner, and motive have been used extensively

15  as guidelines to establish premeditation and deliberation, the Court subsequently held that these

16  categories are "descriptive, not normative," and are "simply an aid for reviewing courts in assessing

17  whether the evidence is supportive of an inference that the killing was a result of preexisting

18  reflection and weighing of considerations rather than mere unconsidered rash impulses."  <u>People v.</u>

19  <u>Cole</u>, 33 Cal. 4th at 1224, citation omitted.  In <u>Perez</u>, the Court further stated that "the Anderson

20  factors, while helpful for purposes of review, are not a *sine qua non* to finding first degree

21  premeditated murder, nor are they exclusive."  <u>People v. Perez</u>, 2 Cal. 4th 1117, 1125 (1992).

22       In any event, the prosecutor specifically argued that the evidence satisfied all three

23  categories established by <u>Anderson</u>.  He argued that Petitioner's motive for the killing was to

24  preserve his image as a "tough guy" who didn't "take nothin' from nobody."  Respondent's Answer

25  at 55.  As for planning, the prosecutor argued that Petitioner decided to get a baseball bat in the

26  garage, went back out to the scene of the confrontation, concealed the bat behind his back, and hit

27

28                                      14

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

the victims from behind without any warning.  Id.  The prosecutor also argued that the manner of

the killing showed premeditation and deliberation because it was not a frenzied attack, resulting

from an emotional outburst, but was a "cold calculated kind of killing because it's a swing delivered

with tremendous force at a very vulnerable part of the body."  Id.  Viewed in a light most favorable

to the prosecution, a rational trier of fact could have found the essential elements of crime beyond a

reasonable doubt.

//

**IV.** **Cumulative effect of the constitutional errors at trial**

As his final claim, Petitioner alleges that the cumulative effect of counsel's alleged errors in

representation denied him a fair trial.  Petition at 24-26; Memorandum at 76-78.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the

cumulative effect of several errors may still prejudice a defendant so much that his conviction must

be overturned.  Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction

where multiple constitutional errors hindered Defendant's efforts to challenge every important

element of proof offered by prosecution).  However, where a petitioner has not demonstrated

prejudice as to individual claims, no cumulative prejudice results.  Davis v. Woodford, 333 F.3d

982, 1007 (9th Cir. 2003), *amended*, 2003 U.S. App. Lexis 27909; see United States v. Rivera,

900 F.2d 1462, 1472 (10th Cir. 1990) ("cumulative error analysis should evaluate only the effect of

matters determined to be error, not the cumulative effect of non-errors").

As noted by this Court in its discussion of issues I to VIII, Petitioner's counsel acted

reasonably and his actions did not cause any prejudice to Petitioner.  Therefore this Court DENIES

Petitioner's contention that he was denied a fair trial due to cumulative error.

## V.  CONCLUSION

The Court finds the California Court of Appeals' determination of Petitioner's claims did

not result in a decision that was contrary to, or involved an unreasonable application of, clearly

established federal law.  Accordingly, the petition for writ of habeas corpus is DENIED.  The clerk

1    shall close the file.

2    Dated: November 30, 2005                    /s/James Ware
     03cv4994.habeas                              JAMES WARE
3                                                 United States District Judge

4

5

6

7

8    **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

9    John R. Grele jgrele@earthlink.net
     Morris Beatus morris.beatus@doj.ca.gov
     Peggy S. Ruffra peggy.ruffra@doj.ca.gov
10

11   **Dated: December 1, 2005**                **Richard W. Wieking, Clerk**

12
                                                 **By:   /s/JW Chambers**
13                                               **Ronald L. Davis**
                                                 **Courtroom Deputy**
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California